IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>REYNALDO DEL CID-CASTILLO,<br><br>*Defendant*. | Case No. 3:25-cr-100 |

### RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS

The defendant, Reynaldo Del Cid-Castillo is charged with one count of illegal reentry after removal, in violation of 8 U.S.C. § 1326(a), for being present in the United States without having obtained the express consent of the Attorney General or his successor, the Secretary of Homeland Security, to re-apply for admission after his prior removal on or about October 16, 2012. The defendant now seeks to "suppress" both his previous removal order and statements he made in those removal proceedings. Def. Mot. To Suppress ("MTS") (ECF No. 22). This Court should deny his motion because the record shows that the Border Patrol agent ("BPA") had "reason to believe" that the defendant was in the country illegally and accordingly conduct an immigration arrest.

**I.      Background**

The defendant is a citizen of El Salvador and was removed from the United States in October 2012 after the U.S. Department of Homeland Security ("DHS") determined that he was inadmissible and placed him into expedited removal proceedings.

On September 19, 2012, at approximately 3:32 p.m., BPA Omar Saenz ("BPA Saenz") of the United States Border Patrol (USBP) discovered the defendant near Donna Texas, just one hour after the defendant had illegally crossed the border between Mexico and the United States via the

1

Rio Grande instead of presenting himself for inspection at a port of entry. MTS, Ex. 1 (ECF No. 22-1), Report of Deportable/Inadmissible Alien (Sep. 19, 2012) ("I-213"). At the time, it was well known that this area of southern Texas had become a new hot spot for illegal crossings into the United States because the Rio Grande Valley is the closest route to Central America, and at the time, was less militarized than the California and Arizona segment of the Southwest border.[1] The number of apprehensions reflected that reality: in the year of the defendant's illegal entry and arrest (2012), DHS reported in its Immigration Enforcement Actions: 2012 Annual Report that the Rio Grande Valley USBP Sector – where Donna is located – had not only the second highest number of USBP apprehensions in the country, but also the highest increase from the previous year.[2]

The Weslaco Border Patrol Station, where BPA Sanchez was assigned, is located in the lower Rio Grande Valley between McAllen and Harlingen, Texas, and "is responsible for forty miles of river with the primary activity at the station being line watch of its river boundary and city patrol to service the surrounding cities."[3] BPAs at the Weslaco Station have various tools at their disposal to locate individuals attempting to enter the United States without inspection including "4 X 4 vehicles, bike patrol, boat patrol, horse patrol, canine, sensors, night vision goggles and infra-red scopes." *Id.*[4]

---

[1] Ted Robbins, *South Texas: The New Hot Spot for Illegal Crossings*, https://www.npr.org/2014/01/19/263896729/south-texas-the-new-hot-spot-for-illegal-crossing (accessed online Nov. 21, 2025).

[2] John F. Simanski & Lesley M. Sapp, Immigration Enforcement Actions: 2012, https://ohss.dhs.gov/sites/default/files/2023-12/Enforcement_Actions_2012.pdf (accessed online Nov. 21, 2025).

[3] *See* https://www.cbp.gov/border-security/along-us-borders/border-patrol-sectors/rio-grande-valley-sector-texas/weslaco-station (accessed online Nov. 21, 2025).

[4] Although the Weslaco Station webpage was last updated in 2016, on November 19, 2025, Homeland Security Investigations ("HSI") Special Agent ("SA") Christopher Garzon spoke with a current duty supervisor (Zavala), who confirmed that the use of seismic sensors to identify and

The defendant's I-213 reflects that he was located at latitude 26.0722 and longitude 98.0855. Google Earth's historical satellite images from December 26, 2010, and January 15, 2014, reveal that that location was, at all relevant times, an uninhabited area of dense brush adjoining the Rio Grande, a river comprising the United States/Mexico border, and about one mile west of the Donna Port of Entry at the Donna-Rio Bravo International Bridge:



---

alert specialty units (e.g. the mountain bike unit here) predated the defendant's apprehension. SA Garzon will be available to testify about his conversation if needed, and all references to it reflect SA Garzon's expected testimony.



During his conversation with HSI SA Garzon, Supervisor Zavala relayed that the area where the defendant was apprehended is known for illegal crossings and regularly monitored for potential incursions from Mexico. Supervisor Zavala explained that the location of the defendant's arrest is a dense brush area near the Rio Grande and the international boundary between the United States and Mexico, and that such areas are common sites of attempted illegal border crossings because the dense brush makes detection more difficult. Zavala also explained that in areas of high-volume illegal crossings – like the area of the defendant's arrest – USBP has installed seismic sensors that alert BPAs of movement that could indicate a possible incursion from Mexico. When BPAs receive alerts from these sensors, they perform a type of investigative tracking known as "sign cutting" until they make contact with the individuals who triggered the sensors. *Id.*[5]

---

[5] *See also*, DHS Sci. & Tech., *Expert Tracker*, accessed Nov. 21, 2025, at:

The defendant's I-213 reflects that BPA Saenz and the other three members of the specialty mountain bike patrol unit located the defendant in this uninhibited dense brush area on the banks of the Rio Grande. The I-213 is specific to the defendant, but as part of his conversation with SA Garzon, Supervisor Zavala queried the DHS event number and located additional information about the encounter, including that the defendant was one of a group of ten people who were found together after having recently crossed the Rio Grande illegally.[6] The I-213 reflects that, after the defendant was temporarily detained for inquiry regarding whether he had any valid entry documents, he "readily admitted" to several key pieces of information relevant to violations of immigration laws: that he was "a citizen and national of El Salvador"; was "not being in possession of any immigration documents that would allow [him] to be or remain in the United States"; and that he "had illegally entered the United States only one hour prior to being stopped by BPA Saenz by rafting across the Rio Grande approximately one mile west of the Donna, Texas Port of Entry." ECF No. 22-1 at 2-3. Given the suspicious circumstances of the encounter with the defendant and the other members of his group, the defendant's admissions regarding his nationality and illegal entry, and the defendant's lack of possession of valid entry documents, BPA Saenz determined that the defendant was likely inadmissible under § 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act (INA) [8 U.S.C. § 1182], and therefore subject to removal, so he arrested the

---

https://www.dhs.gov/archive/publication/st-expert-tracker-fact-sheet-and-video.

[6] This information largely comes from the expected testimony of SA Garzon, though it is also supported by the limited additional records that were found. Because they can only be properly understood within the context of such testimony, they are not attached to this Response, but they have been provided to defense. Undersigned counsel is working with DHS representatives to ascertain whether there are any other extant records, including about the sensor activation leading to the defendant's apprehension. Given that this information is not the kind regularly included in a defendant's Alien file ("A-file") and that the arrest happened more than thirteen years ago, the likelihood of such a discovery is low, but the United States will continue to disclose any such information as it is found.

defendant and brought him to Weslaco Border Patrol Station. *Id.*

After the defendant was processed there, BPA Antelmo Castillo took the defendant's sworn statement on September 20, 2012. Mot. to Dismiss ("MTD"), Ex. 2 (ECF No. 21-2), Rec. of Sworn Stmt. BPA Castillo communicated with the defendant in Spanish and reviewed the content of the "Record of Sworn Statement in Proceedings under Section 235(b)(1) of the [Immigration and Nationality Act] (INA)" with him. *Id.* at 1. This form included an explanation of rights and an advisement that the defendant "d[id] not appear to be admissible or to have the required legal papers authorizing [his] admission to the United States" and that "this may result in [him] being denied admission and immediately returned to [his] home country without a hearing." *Id.* In his statement to BPA Castillo, the defendant admitted to being a citizen of El Salvador and said he had entered the United States by crossing the Rio Grande. *Id.* at 2. He denied any fear or concern about returning to El Salvador and said he had entered the United States "to work and live." *Id.* at 2–4. After confirming that he had no questions nor anything to add, the defendant signed his sworn statement, including an acknowledgment that it had been read to him, as did the other witness agent. *Id.* at 4.

As is common in such cases of such apprehensions close to the border with admissions, DHS determined the same day that the defendant was subject to expedited removal from the United States under Section 235(b)(1) of the INA (8 U.S.C. § 1225(b)(1)) as one who lacked any valid entry document and was therefore inadmissible to the United States under Section 212(a)(7). MTD, Exh. 3 (ECF No. 21-3), Not. & Or. of Expedited Removal (Sept. 20, 2012) – Form I-860. BPA Castillo completed and signed the order of removal. *Id.* A supervisor, Acting Field Operations Supervisor Raul Rodriguez, reviewed and approved the order. *Id.* DHS provided the defendant with a notice that he was not admissible. ECF No. 21-4, Not. to Alien Ordered Removed/Departure

Verification" (Sept. 20, 2012). Less than a month later, on or about October 16, the defendant was removed from the United States to El Salvador via a chartered deportation flight from San Antonio, Texas. *Id.*

After this removal, the defendant illegally returned to the United States and came to the attention of U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations ("ICE ERO") officials following his arrest by police officers in Henrico County, Virginia for the offense of Domestic Assault and Battery–Family Member, in violation of Va. Code § 18.2-57.2, in connection with a December 29, 2023, incident. Henrico Cnty. J&DR Case # JA103003-01-00. He received a deferred disposition in that case on March 25, 2024, and has a dispositional hearing scheduled in that matter for March 27, 2026. *Id.* On June 17, 2025, a grand jury indicted the defendant on one count of Reentry of Removed Alien, in violation of 8 U.S.C. § 1326(a). ECF No. 3, Indictment.

**II.    Because BPA Saenz Had Reason to Believe the Defendant was in the Country Illegally, His Warrantless Immigration Arrest of the Defendant Was Lawful.**

The evidence is overwhelming that BPA Saenz had "reason to believe" that the defendant was in the country illegally, as is required to support a warrantless immigration arrest, so his 2012 immigration arrest of the defendant was lawful and his suppression motion must be denied.

An alien present in the United States who was inadmissible when he entered is deportable. 8 U.S.C. § 1227(a)(1)(A) & (B). An alien, such as the defendant, is inadmissible where he lacks a valid unexpired entry document such as a visa, reentry permit, or border crossing identification card. 8 U.S.C. § 1182(a)(7)(i)(I). Pursuant to expedited removal procedures, where an immigration officer "determines that an alien . . . is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title, the officer shall order the alien removed from the United States without further hearing or review[.]"). 8 U.S.C. § 1225(b)(1)(A)(i).

7

BPAs are given authority to, in fact, "patrol the border." 8 C.F.R. § 287.5(b)(1). Pursuant to 8 C.F.R. § 287.5(a)(1), immigration officers are authorized, under 8 USC 1357(a)(1), "to interrogate, without a warrant, any alien or person believed to be an alien concerning his or her right to be, or to remain, in the United States." An immigration officer has the right to "ask questions of anyone as long as the immigration officer does not restrain the freedom of an individual, not under arrest, to walk away." 8 C.F.R. § 287.8(b)(1). Moreover, the immigration officer can briefly detain an individual for questioning if the officer has "reasonable suspicion, based on specific articulable facts, that the person being questioned is . . . an alien illegally in the United States." 8 C.F.R. § 287.8(b)(2).

This is similar to a brief investigatory stop—known as a '*Terry* stop'—predicated on reasonable, articulable suspicion that 'criminal activity may be afoot.'" *United States v. Mitchell*, 963 F.3d 385, 390 (4th Cir. 2020) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *see also Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). Criminality is "afoot," and a *Terry* stop is therefore justified, "when the police officer reasonably suspects that the person apprehended is committing *or has committed* a criminal offense." *Arizona v. Johnson*, 555 U.S. 323, 326 (2009) (citing *Terry*) (emphasis added); *see also United States v. Robinson*, 846 F.3d 694, 698 (4th Cir. 2017). To justify a *Terry* stop, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the stop. *Terry*, 392 U.S. at 21. "Evidence that would support only 'a mere "hunch" is insufficient,' though a reasonable basis need not establish probable cause and may well 'fall[ ] considerably short of satisfying a preponderance of the evidence standard.'" *United States v. Massenburg*, 654 F.3d 480, 485 (4th Cir. 2011) (alteration in original) (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)). "In evaluating the validity of a *Terry* stop, we must consider 'the totality of the circumstances—the

whole picture.'" *Mitchell*, 963 F.3d at 390 (quoting *United States v. Sokolow*, 490 U.S. 1, 8 (1989) (internal quotation marks omitted)). "The principal components of a determination of reasonable suspicion . . . will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). "Facts innocent in themselves may together amount to reasonable suspicion; officers are permitted to conduct investigative stops 'based on what they view as suspicious—albeit even legal—activity.'" *Mitchell* at 390 (quoting *United States v. Perkins*, 363 F.3d 317, 326 (4th Cir. 2004); *see also Terry* at 22–23). "And because reasonable suspicion is a less demanding standard, it can arise 'from information that is less reliable than that required to show probable cause.'" *Mitchell* at 390 (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)).

Courts determining reasonable suspicion "must give due weight to 'commonsense judgments and inferences about human behavior' made by officers in light of their experience and training." *Mitchell* at 390 (quoting *Wardlow*, 528 U.S. at 125); *see also Perkins*, 363 F.3d at 321. "The standard 'depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Kansas v. Glover*, 589 U.S. 376 (2020) (emphasis omitted) (quoting *Navarette v. California*, 572 U.S. 393, 402 (2014)). Thus, while "more than an 'inchoate and unparticularized suspicion or hunch'" is required, *Wardlow*, 528 U.S. at 124, (quoting *Terry* at 27), courts should also "credit[ ] the practical experience of officers who observe on a daily basis what transpires on the street," *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993). "A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be the most reasonable in light of the facts known to the officer at the time." *Adams v. Williams,* 407 U.S. 143,

146 (1972).

BPAs are authorized to act in accordance with 8 USC § 1357(a)(2), relating to warrantless arrest. Under 8 U.S.C. § 1357(a)(2), BPAs are permitted to:

> arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest[.]

8 U.S.C.A. § 1357(a)(2).

Accompanying regulations provide that the following "standards for enforcement activities" concerning immigration arrests:

> (c)(2)(i) An arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested ... is an alien illegally in the United States.
>
> (ii) A warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained.

8 C.F.R. § 287.8(c)(2)(i)-(ii).

Courts have interpreted the "reason to believe" standard as equivalent to probable cause under the Fourth Amendment. *United States v. Segura-Gomez*, No. 4:17-CR-65-FL-1, 2018 WL 6582823, at *6 (E.D.N.C. May 25, 2018), report and recommendation adopted, No. 4:17-CR-65-FL-1, 2018 WL 6259222 (E.D.N.C. Nov. 30, 2018) (collecting cases). "Probable cause to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed ... an offense." *Id.* (quoting *Cahaly v. Larosa*, 796 F.3d 399, 407 (4th Cir. 2015)).

As explained in detail *supra*, the defendant was found by BPA Saenz near Donna, Texas, in an area of dense brush directly next to the Rio Grande River, in a group of ten individuals, shortly after illegally crossing the Mexico-United States border via the Rio Grande River, a rural area known for illegal crossings. The defendant was found by the specialty mountain bike BPAs who are utilized in this area because of the dense brush used by aliens to attempt to avoid detection. The totality of those circumstances provided BPA Saenz with "reasonable suspicion" that the defendant was "an alien illegally in the United States." 8 C.F.R. § 287.8(b)(2). Given these circumstances, BPA Saenz exercised his authority under 8 U.S.C. § 137(a)(1) to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." BPAs are authorized to conduct such interrogations without a warrant. *Id.* The I-213 reflects that "upon questioning, subject readily admitted to being a citizen and national of El Salvador and to not being in possession of any immigration documents that would allow the subject to be or remain in the United States." ECF No. 22-1 at 2-3. It was only after these admissions that the defendant was arrested and transported to the Weslaco Border Patrol Station for processing.

Based on the defendant's admission that he was in the country unlawfully and that the defendant was unable to produce any documents allowing his admission, BPA Saenz had reason to believe that defendant was an alien subject to deportation. *See, e.g.*, *United States v. Sanchez-Velasco*, 956 F.3d 576, 581 (8th Cir. 2020) (defendant's admission to ICE officer that he was unlawfully present in the United States satisfied the "reason to believe" language of § 1357(a)(2) justifying a warrantless arrest); *Brito Matom v. U.S. Immigr. & Customs Enf't*, No. 2:25-CV-648-JES-NPM, 2025 WL 2577424, at *2 (M.D. Fla. Sept. 5, 2025) (warrantless arrest was justified where defendant admitted to BPAs during a traffic stop that he was illegally present in the United States). BPA Saenz had reason to believe that the defendant was likely to escape before a warrant

11

could be obtained given that Defendant was stopped in an uninhabited field directly next to the Rio Grande River, the border between Mexico and the United States. Accordingly, BPA Saenz had probable cause to make a warrantless immigration arrest for deportation proceedings under 8 U.S.C. § 1357(a)(2).

**III.    Defendant Cannot Circumvent the Requirements of 8 U.S.C. § 1326(d) by Styling his Motion as a Motion to Suppress**

While the defendant styles his motion as a motion to "suppress," it appears to be an attempt at an end-run around the requirements of 8 U.S.C. § 1326(d) which codifies the limited circumstances where a defendant can collaterally attack his prior removal order. The thrust of the defendant's motion is to challenge the validity of his prior removal order, by claiming that it was secured in violation of the Fourth Amendment because there is allegedly no "attenuation between the arrest and Mr. Del Cid's statements and the removal order." MTS at 3. While the defendant cites *United States v. Terry*, 909 F.3d 716 (4th Cir. 2018) for the proposition that his removal order is subject to suppression if it was "discovered as a result of a Fourth Amendment violation," *Terry* is not an immigration case, nor does it address whether removal orders can be "suppressed." Rather, *Terry* is a drug case where the defendant appealed his conviction for possession of methamphetamine following a traffic stop. *Id*. A removal order is not a piece of evidence seized or acquired as part of a search or arrest, rather it is the consequence of the location of an individual who is inadmissible because he lacks the required entry documents.

The law is clear that a defendant charged with illegal reentry has limited avenues to attack a prior removal order. A defendant may only collaterally attack the underlying removal order by showing:

(1) he has exhausted his administrative remedies to challenge that order;

(2) the removal proceedings improperly deprived him of an opportunity for judicial review;

and

(3) entry of the order was fundamentally unfair.

8 U.S.C. § 1326(d). Because the three requirements of § 1326(d) are stated in the conjunctive, they are mandatory, and a defendant must satisfy all three in order to prevail in a collateral attack. *United States v. Palomar-Santiago*, 593 U.S. 321, 326 (2021) (reversing Ninth Circuit ruling excusing defendant from satisfying the first two elements because defendant was removed for an offense that did not render him removable).

The burden of proof to establish that the elements of Section 1326(d) have been satisfied "rests with the defendant". . . [and] "the defendant must meet his burden under § 1326(d) by a preponderance of the evidence." *United States v. Galcia*, No. 1:15cr59, 2016 WL 4054926, at *2 (E.D. Va. July 26, 2016). The government need only show that the defendant failed to establish one of the § 1326(d) requirements to defeat a collateral attack on the removal order. Even if a defendant could satisfy (d)(1) or (2), if he cannot satisfy § 1326(d)(3), he would still not be entitled to relief. *See United States v. Moreno-Tapia*, 848 F.3d 162, 171 (4th Cir. 2017) (declining to reach § 1326(d)(2) where defendant could not satisfy § 1326(d)(3)); *United States v. Wilson*, 316 F.3d 506, 511 n.3 (4th Cir. 2003) (same).

A defendant who seeks to challenge the validity of his deportation order must demonstrate that "the entry of the [2012 removal] order was fundamentally unfair." 8 U.S.C. § 1326(d)(3). In order to establish fundamental unfairness, a defendant must show that (1) his due process rights were violated by defects in his underlying removal proceeding, and (2) he suffered prejudice as a result of the defects. *United States v. El Shami*, 434 F.3d 659, 664 (4th Cir. 2005). It is the defendant's burden to show there is a reasonable likelihood the result of the removal proceeding would have been different had the error he now complains of been remedied. *Id.* at 665.

Notably, the defendant has not addressed the elements of § 1326(d) anywhere in his suppression motion. And for good reason—it is impossible to show that the result of the removal proceeding would have been any different because even if the Court were to assume for argument's sake that the defendant's admissions to the BPAs were secured in violation of the Fourth Amendment, there is settled Supreme Court caselaw that "the exclusionary rule does not apply in a deportation proceeding." *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1033 (1984) ("the rule does not apply so as to require that respondent Sandoval–Sanchez' admission of illegal entry after his allegedly unlawful arrest be excluded from evidence at his deportation hearing.").

In a § 1326(d) challenge, it is the defendant's burden to show he would not have been removed but, for the alleged due process violation. As his statements would have been admissible as evidence in his deportation proceeding regardless due to *Lopez-Mendoza*, he cannot satisfy his burden to show that he would not have been removed. Even if his admissions were suppressed, and his admissions could not be used against him, the defendant's removal order is a result of the BPAs' knowledge of the presence of an individual lacking valid entry documents, not necessarily his statements. *See, e.g.*, *United States v. Mejia-Delgado*, 42 F. App'x 575, 577 (4th Cir. 2002) (denying motion to suppress the discovery of defendant's unlawful presence in the United States because "regardless of the legality of the search warrant, the discovery of Mejia–Delgado's identity and presence in the United States was not suppressible as the fruit of an unlawful arrest.").

### IV. Even if the Defendant's Immigration Arrest Lacked Probable Cause, the Defendant's Statements and Removal Order are Not Suppressible Unless they were Obtained by Exploitation of the Purported Initial Police Illegality

Putting aside the defendant's attempted end-run around the requirements for a collateral attack, even if a removal order were "suppressible" or his prior statements were suppressible due to his alleged Fourth Amendment violation, he neglects to address the Fourth Circuit's required analysis for *whether* evidence *should* be suppressed in the case of a violation of the Fourth

14

Amendment. In *United States v. Oscar-Torres*, the Fourth Circuit held that even in the case of a violation of the Fourth Amendment, a district court should not suppress an alien's fingerprints and attendant records[7] unless there was evidence of exploitation. 507 F.3d 224, 230 (4th Cir. 2007).

In *Oscar-Torres*, the Fourth Circuit joined its sister circuits in pronouncing a rule that "when police officers use an illegal arrest as an investigatory device in a criminal case 'for the purpose of obtaining fingerprints without a warrant or probable cause,' then the fingerprints are inadmissible under the exclusionary rule as 'fruit of the illegal detention.'" *Id.* at 230-231. "Thus, fingerprints do not constitute suppressible fruit of an unlawful arrest or detention unless the unlawful arrest 'was purposefully exploited in order to develop critical evidence of criminal conduct to be used against [the d]efendant' in a criminal proceeding." *Id*. at 231 (citing *Olivares-Rangel*, 458 F.3d 1104, 1113 (10th Cir. 2006)). In distinguishing illegal reentry cases from other cases dealing with the suppression of fingerprints, the Fourth Circuit emphasized that the taking of fingerprints by ICE is often for administrative purposes and intended for administrative process, like deportation. *Id.* at 231. The Fourth Circuit cautioned that "a court must focus on the 'purpose' for the illegal arrest and fingerprinting." *Id.* at 232.

Finally, in underscoring the rationale for the exploitation analysis (the need for deterrence to intentional police misconduct), the Fourth Circuit in *Oscar-Torres* adopted the same rationale from *Lopez-Mendoza*:

> If illegally obtained evidence that law enforcement officers intend to use in civil deportation hearings cannot be suppressed because exclusion will not effectively deter unlawful arrests, as *Lopez–Mendoza* holds, 468 U.S. at 1042–46, 104 S.Ct. 3479, then suppressing that evidence in an unanticipated and unforeseen criminal prosecution surely cannot provide any additional *ex ante* deterrence. Of course, as

---

[7] Oscar-Torres sought to suppress all evidence "regarding the discovery" of his "presence." 507 F.3d at 226. The government stipulated that it would not be using the statements that Oscar-Torres made as part of the unlawful arrest, and as such, the Fourth Circuit's analysis was focused on fingerprints which led to the discovery of his prior criminal record and prior deportation.

15

> the Court assumed in *Lopez–Mendoza,* when law enforcement officers "intend[ ] or expect[ ]" that an arrest will lead to a criminal prosecution as well as (or instead of) a deportation proceeding, then the "exclusionary rule ... continue[s] to apply" and the fingerprints must be suppressed. 468 U.S. at 1042–43, 104 S.Ct. 3479.

507 F.3d at 231.

The Fourth Circuit then turned the facts of Oscar-Torres' case. It noted that Oscar-Torres had been "targeted" by immigration agents "not because he was an illegal alien, but because he was an illegal alien gang member." *Id.* Unlike BPA Saenz conducting a mountain bike patrol of the area known for illegal border crossings, the officers in *Oscar-Torres* conducted a warrantless arrest motivated by their belief that Oscar-Torres was a member of a dangerous gang, and as part of an investigation to target gang members. Ultimately, the Fourth Circuit remanded the case to the district court to ascertain whether the gathering of fingerprints (and attendant records) was motivated by an administrative purpose (deportation) or an administrative purpose (prosecution) and instructed that if the evidence was motivated solely by an administrative purpose, it must be admitted. *Id.* at 232.

The Fourth Circuit revisited its Oscar-Torres decision again in 2023 in *United States v. Villa*. 70 F.4th 704 (4th Cir. 2023). In an illegal reentry case, the Fourth Circuit was faced with evaluating a motion to suppress a defendant's fingerprint records, and the criminal and immigration records they uncovered. The Fourth Circuit held that "nor is suppression warranted because the fingerprints were later revealed to have investigatory value to law enforcement. Again, under *Oscar-Torres*, the focus is on law enforcement's purpose for the illegal arrest and fingerprinting, not whether, looking retrospectively, officers obtained an investigatory benefit from an otherwise routine booking procedure." 70 F.4th at 717.

There is no allegation or evidence that BPA Saenz or BPA Castillo's interviews of the defendant, his fingerprinting, or his removal proceedings and resulting order, were for any purpose

16

other than standard ministerial procedures when processing non-citizens who may be subject to removal. Nor does the defendant argue (as required by *Oscar-Torres*) that the use of his prior statements and expedited removal order is an exploitation of unconstitutional tactics, or that suppressing that evidence in an unanticipated and unforeseen criminal prosecution *thirteen years later* would provide any additional *ex ante* deterrence.

\* \* \*

For the foregoing reasons, the Court should deny the defendant's motion to suppress.

Respectfully submitted,

Lindsey Halligan
United States Attorney

By /s/

Carla Jordan-Detamore
Virginia Bar No. 85934
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
919 East Main Street, Suite 1900
Richmond, Virginia 23219
(804) 819-7426
Carla.Jordan-Detamore@usdoj.gov